# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | |
|---|---|
| HANSA THOMAS, individually and on behalf of herself and all others similarly situated,<br><br>     Plaintiff,<br><br>v.<br><br>FORETHOUGHT LIFE INSURANCE COMPANY, an Indiana corporation; GLOBAL ATLANTIC INSURANCE NETWORK LLC, a Delaware limited liability company; and THE GLOBAL ATLANTIC FINANCIAL GROUP LLC, a foreign limited liability company,<br><br>     Defendants. | Case No._____<br><br>**CLASS ACTION COMPLAINT**<br><br><br>JURY TRIAL DEMAND |

Plaintiffs Hansa Thomas ("Plaintiff" or "Thomas"), individually and on behalf of all similarly situated persons, alleges the following against Defendants Global Atlantic Insurance Network LLC, Forethought Life Insurance Company, and The Global Atlantic Financial Group LLC (collectively, "Global Atlantic" or "Defendants") based upon personal knowledge with respect to herself and upon information and belief derived from, among other things, investigation by her counsel and review of public documents, as to all other matters:

## I.   NATURE OF THE ACTION

1.     Plaintiff brings this class action against Global Atlantic for its failure to properly secure and safeguard Plaintiff's and other similarly situated Global Atlantic customers' sensitive information, including full names, addresses, dates of birth, and Social Security numbers ("personally identifiable information" or "PII").

2.      Global Atlantic is a "retirement and life insurance company, with a broad range of competitive and innovative products…"[1]

3.      Upon information and belief, current and former customers at Global Atlantic are required to entrust Global Atlantic, directly or indirectly, with sensitive, non-public PII, without which Global Atlantic could not perform its regular business activities, in order to obtain financial and/or other services. Global Atlantic retains this information for at least many years and even after the consumer relationship has ended.

4.      By obtaining, collecting, using, and deriving a benefit from the PII of Plaintiff and Class Members, Global Atlantic assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

5.      On or about June 7, 2023, Global Atlantic learned that one of its IT vendors had been penetrated by a cyberattack and that "cyber criminals accessed one of their MOVEit transfer servers on May 29 and May 30, 2023, and downloaded certain data from that system."[2] The stolen data included "personal data for an uncertain number of [Global Atlantic] policyholders"[3] – Plaintiff and the Class Members.

6.      According to a letter sent to Plaintiff and Class Members on behalf of Global Atlantic (the "Notice Letter"), the compromised PII included individuals' names, Social Security numbers, dates of birth, policy numbers, gender, and state.[4]

---

[1]  https://www.globalatlantic.com/meet-global-atlantic (last visited Aug. 17, 2023).
[2]  The "Notice Letter". A sample copy is available at  https://oag.ca.gov/system/files/California%20Sample%20Policyholder%20Notification%20Template_Redacted.pdf (last visited Aug. 28, 2023).
[3] *Id.*
[4] *Id.*

7.      Global Atlantic failed to adequately protect Plaintiff's and Class Members PII—and failed to even encrypt or redact this highly sensitive information. This unencrypted, unredacted PII was compromised due to Global Atlantic's negligent and/or careless acts and omissions and its utter failure to protect customers' sensitive data. Hackers targeted and obtained Plaintiff's and Class Members' PII because of its value in exploiting and stealing the identities of Plaintiff and Class Members. The present and continuing risk to victims of the Data Breach will remain for their respective lifetimes.

8.      Plaintiff brings this action on behalf of all persons whose PII was compromised as a result of Global Atlantic's failure to: (i) adequately protect the PII of Plaintiff and Class Members; and (ii) warn Plaintiff and Class Members of its inadequate information security practices. Global Atlantic's conduct amounts at least to negligence and violates federal and state statutes.

9.      Global Atlantic disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to implement and maintain adequate and reasonable measures and ensure those measures were followed by its IT vendors to ensure that the PII of Plaintiff and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use. As a result, the PII of Plaintiff and Class Members was compromised through disclosure to an unknown and unauthorized third party.

10.     Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

11.     Plaintiff and Class Members have suffered injury as a result of Global Atlantic's conduct. These injuries include: (i) invasion of privacy; (ii) lost or diminished value of PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; and (v) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Global Atlantic's possession and is subject to further unauthorized disclosures so long as Global Atlantic fails to undertake appropriate and adequate measures to protect the PII.

12.     Plaintiff seeks to remedy these harms and prevent any future data compromise on behalf of herself and all similarly situated persons whose personal data was compromised and stolen as a result of the Data Breach and who remain at risk due to Global Atlantic's inadequate data security practices.

13.     Plaintiff seeks remedies including, but not limited to, compensatory damages, nominal damages, and reimbursement of out-of-pocket costs.

14.     Plaintiff also seeks injunctive and equitable relief to prevent future injury on behalf of herself and the putative Class.

## II.   PARTIES

15.     Plaintiff Hansa Thomas is, and at all times mentioned herein was, a citizen of Seattle, King County, Washington.

16.     Defendant Global Atlantic Insurance Network LLC is a Delaware limited liability company with its principal place of business located at 215 10th Street, Suite 110, Des Moines, Iowa 50309.

17.    Defendant Forethought Life Insurance Company is an Indiana corporation with its principal place of business located at 10 West Market Street, Suite 2300, Indianapolis, Indiana 46204.

18.    Upon information and belief, Defendant, The Global Atlantic Financial Group LLC is a Bermuda limited liability company.

### III.    JURISDICTION AND VENUE

19.    The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is over 100, many of whom reside outside the State of Indiana and have different citizenship from Defendants, including Plaintiff. Thus, minimal diversity exists under 28 U.S.C. §1332(d)(2)(A).

20.    This Court has jurisdiction over Defendants because they operate in this District, and because Defendant Forethought Life Insurance Company has its principal place of business and headquarters in this District.

21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District, Defendants have harmed Class Members residing in this District, and Defendant Forethought Life Insurance Company has its principal place of business and headquarters in this District.

### IV.    FACTUAL ALLEGATIONS

#### *Global Atlantic's Business*

22.    Global Atlantic is a "retirement and life insurance company, with a broad range of competitive and innovative products…"[5]

---

[5] https://www.globalatlantic.com/meet-global-atlantic (last visited Aug. 17, 2023).

23.     Plaintiff and Class Members are current and former customers of Global Atlantic.

24.     As a condition of receiving its products and/or services, Global Atlantic requires that its customers, including Plaintiff and Class Members, entrust it with highly sensitive personal information.

25.     The information held by Global Atlantic in its and its vendor's computer systems at the time of the Data Breach included the unencrypted PII of Plaintiff and Class Members.

26.     Upon information and belief, Global Atlantic made promises and representations to its customers, including Plaintiff and Class Members, that the PII collected from them as a condition of obtaining products and/or services at Global Atlantic's companies would be kept safe, confidential, that the privacy of that information would be maintained, and that Global Atlantic would delete any sensitive information after it was no longer required to maintain it.

27.     Indeed, Global Atlantic's Privacy Policy provides that: "Protecting your personal information and respecting your privacy is important to us. We respect your privacy rights and choices, which may vary based on your interactions with us or your relationship to us. These resources can help you understand how we use your personal information and how you can manage your privacy choices."[6]

28.     Plaintiff and Class Members provided their PII to Global Atlantic, directly or indirectly, with the reasonable expectation and on the mutual understanding that Global Atlantic would comply with its obligations to keep such information confidential and secure from unauthorized access.

29.     Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their PII. Plaintiff and Class Members relied on the sophistication of Global

---

[6] https://www.globalatlantic.com/privacy-policy (last visited Aug. 17, 2023).

Atlantic to keep their PII confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiff and Class Members value the confidentiality of their PII and demand security to safeguard their PII.

30.     Global Atlantic had a duty to adopt reasonable measures to protect the PII of Plaintiff and Class Members from involuntary disclosure to third parties and to audit, monitor, and verify the integrity of its vendors and affiliates. Global Atlantic has a legal duty to keep consumer's PII safe and confidential.

31.     Global Atlantic had obligations created by FTC Act, Gramm-Leach-Bliley Act, contract, industry standards, and representations made to Plaintiff and Class Members, to keep their PII confidential and to protect it from unauthorized access and disclosure.

32.     Global Atlantic derived a substantial economic benefit from collecting Plaintiff's and Class Members' PII. Without the required submission of PII, Global Atlantic could not perform the services it provides.

33.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Global Atlantic assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

***The Data Breach***

34.     On or about July 28, 2023, Pension Benefit Information, LLC, on behalf of Global Atlantic, began sending letters to Plaintiff and other Data Breach victims (the "Notice Letter"), informing them that:

> **What happened?** On or around May 31, 2023, Progress Software disclosed that cyber criminals had actively exploited an unknown vulnerability in its MOVEit file transfer application. Because MOVEit is used by thousands of organizations to support the secure transfer of data for common business activities, this incident has

affected many companies around the world. One of the organizations impacted by the MOVEit incident is PBI. PBI is a third-party vendor that provides services to insurance companies, including subsidiaries of Global Atlantic.

Upon learning of the incident, PBI initiated an investigation, which revealed that cyber criminals accessed one of their MOVEit transfer servers on May 29 and May 30, 2023, and downloaded certain data from that system. On June 7, 2023, PBI notified Global Atlantic that personal data for an uncertain number of policyholders had likely been taken by the cyber criminals.

**What information was involved?** Based on our analysis of the impacted data, we believe that the following categories of personal identifiable information related to you were impacted: **Name, Social Security Number, Date of Birth, Policy Number(s), Gender, State**.[7]

35.     Omitted from the Notice Letter were the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their PII remains protected.

36.     This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff and Class Members of the Data Breach's critical facts. Without these details, Plaintiff's, and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

37.     Global Atlantic did not use reasonable security procedures and practices appropriate to the nature of the sensitive information it was maintaining for Plaintiff and Class Members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed. Moreover, Global Atlantic failed to exercise due diligence in selecting its vendors and deciding with whom it would share sensitive PII.

---

[7] Notice Letter.

38.    The attacker accessed and acquired files Global Atlantic shared with a third party containing unencrypted PII of Plaintiff and Class Members, including their Social Security numbers and other sensitive information.

39.    Plaintiff's and Class Members' PII was accessed and stolen in the Data Breach.

40.    Plaintiff further believes her PII, and that of Class Members, was subsequently sold on the dark web following the Data Breach, as that is the modus operandi of cybercriminals that commit cyber-attacks of this type.

### *Global Atlantic Acquires, Collects, and Stores Plaintiff's and Class Members' PII*

41.    As a condition to obtain products and/or services from Global Atlantic, Plaintiff and Class Members were required to give their sensitive and confidential PII, directly or indirectly, to Global Atlantic.

42.    Global Atlantic retains and stores this information and derives a substantial economic benefit from the PII that it collects. But for the collection of Plaintiff's and Class Members' PII, Global Atlantic would be unable to perform its services.

43.    By obtaining, collecting, and storing the PII of Plaintiff and Class Members, Global Atlantic assumed legal and equitable duties and knew or should have known that it was responsible for protecting the PII from disclosure.

44.    Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on Global Atlantic to keep their PII confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

45.    Global Atlantic could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the PII of Plaintiff and Class Members or by

exercising due diligence in selecting its vendors and properly auditing those vendors' security practices.

46.    Upon information and belief, Global Atlantic made promises to Plaintiff and Class Members to maintain and protect their PII, demonstrating an understanding of the importance of securing PII.

47.    Indeed, Global Atlantic's Privacy Policy provides that: "Protecting your personal information and respecting your privacy is important to us. We respect your privacy rights and choices, which may vary based on your interactions with us or your relationship to us. These resources can help you understand how we use your personal information and how you can manage your privacy choices."[8]

48.    Global Atlantic's negligence in safeguarding the PII of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

### _Global Atlantic Knew or Should Have Known of the Risk Because Insurance Companies in Possession of PII Are Particularly Suspectable to Cyber Attacks_

49.    Global Atlantic's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting insurance companies that collect and store PII, like Global Atlantic, preceding the date of the Data Breach.

50.    Data thieves regularly target companies like Global Atlantic's due to the highly sensitive information that they have custody of. Global Atlantic knew and understood that unprotected PII is valuable and highly sought after by criminal parties who seek to illegally monetize that PII through unauthorized access.

---

[8] https://www.globalatlantic.com/privacy-policy (last visited Aug. 17, 2023).

51.     In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68 percent increase from 2020.[9]

52.     Indeed, cyber-attacks, such as the one experienced by Global Atlantic, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, smaller entities that store PII are "attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[10]

53.     In light of recent high profile data breaches at other industry leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Global Atlantic knew or should have known that the PII that it collected and maintained would be targeted by cybercriminals.

54.     As a custodian of PII, Global Atlantic knew, or should have known, the importance of safeguarding the PII entrusted to it by Plaintiff and Class Members, and of the foreseeable consequences if it's or its vendor's data security systems were breached, including the significant costs imposed on Plaintiff and Class Members as a result of a breach.

---

[9] *See* 2021 Data Breach Annual Report (ITRC, Jan. 2022) (available at https://notified. idtheftcenter.org/s/), at 6.
[10] https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter &utm_medium=email&utm_campaign=consumerprotection (last visited Aug. 17, 2023).

55.    Despite the prevalence of public announcements of data breach and data security compromises, Global Atlantic failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

56.    At all relevant times, Global Atlantic knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members and of the foreseeable consequences that would occur if it or its vendor's data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

57.    Additionally, as companies became more dependent on computer systems to run their business,[11] *e.g.*, working remotely as a result of the COVID-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[12]

58.    Global Atlantic was, or should have been, fully aware of the unique type and the significant volume of data on its and its vendor's server(s), amounting to potentially hundreds of thousands of individuals', including 15,560 Massachusetts residents and 5,732 Delaware residents, detailed PII, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

59.    In the Notice Letter, Global Atlantic offers to cover identity monitoring services for a period of two years. This is wholly inadequate to compensate Plaintiff and Class Members as it fails to provide for the fact victims of data breaches and other unauthorized disclosures

---

[11]https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html (last visited Aug. 17, 2023).
[12]https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022 (last visited Aug. 17, 2023).

commonly face multiple years of ongoing identity theft, financial fraud, and it entirely fails to provide sufficient compensation for the unauthorized release and disclosure of Plaintiff and Class Members' PII. Moreover, once this service expires, Plaintiff and Class Members will be forced to pay out of pocket for necessary identity monitoring services.

60.     Global Atlantic's offer of credit and identity monitoring establishes that Plaintiff's and Class Members' sensitive PII was in fact affected, accessed, compromised, and exfiltrated from Global Atlantic's and/or its vendor's computer systems.

61.     The injuries to Plaintiff and Class Members were directly and proximately caused by Global Atlantic's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

62.     The ramifications of Global Atlantic's failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen—particularly Social Security numbers—fraudulent use of that information and damage to victims may continue for years.

63.     As an insurance company in possession of its current and former customers' PII, Global Atlantic knew, or should have known, the importance of safeguarding the PII entrusted to it by Plaintiff and Class Members and of the foreseeable consequences if its or its vendor's data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members as a result of a breach. Nevertheless, Global Atlantic failed to take adequate cybersecurity measures to prevent the Data Breach.

***Value of Personally Identifiable Information***

64.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[13]

---

[13] 17 C.F.R. § 248.201 (2013).

The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[14]

65.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[15]

66.     For example, PII can be sold at a price ranging from $40 to $200.[16] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[17]

67.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—names and Social Security numbers.

---

[14] *Id.*

[15] *Your personal data is for sale on the dark web. Here's how much it costs*, Digital Trends, Oct. 16, 2019, available at: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-howmuch-it-costs/ (last visited Aug. 17, 2023).

[16] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, available at: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-informationis-selling-for-on-the-dark-web/ (last visited Aug. 17, 2023).

[17]     *In the Dark*, VPNOverview, 2019, available at: https://vpnoverview.com/privacy/anonymousbrowsing/in-the-dark/ (last visited Aug. 17, 2023).

68.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[18]

69.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

70.     The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[19]

### *Global Atlantic Failed to Comply with FTC Guidelines*

71.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in

---

[18] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), available at: https://www.networkworld.com/article/2880366/anthem-hackpersonal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Aug. 17, 2023).
[19] *Report to Congressional Requesters*, GAO, at 29 (June 2007), available at: https://www.gao.gov/assets/gao-07-737.pdf (last visited Aug. 17, 2023).

violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

72.     In October 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

73.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

74.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

75.     These FTC enforcement actions include actions against insurance companies, like Global Atlantic.

76.     As evidenced by the Data Breach, Global Atlantic failed to properly implement basic data security practices and failed to audit, monitor, or ensure the integrity of its vendor's data security practices. Global Atlantic's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

77.     Global Atlantic was at all times fully aware of its obligation to protect the PII of its customers yet failed to comply with such obligations. Global Atlantic was also aware of the significant repercussions that would result from its failure to do so.

### *Global Atlantic Failed to Comply with the Gramm-Leach-Bliley Act*

78.     Global Atlantic is a financial institution, as that term is defined by Section 509(3)(A) of the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6809(3)(A), and thus is subject to the GLBA.

79.     The GLBA defines a financial institution as "any institution the business of which is engaging in financial activities as described in Section 1843(k) of Title 12 [The Bank Holding Company Act of 1956]." 15 U.S.C. § 6809(3)(A).

80.     Global Atlantic collects nonpublic personal information, as defined by 15 U.S.C. § 6809(4)(A), 16 C.F.R. § 313.3(n) and 12 C.F.R. § 1016.3(p)(1). Accordingly, during the relevant time period, Global Atlantic was subject to the requirements of the GLBA, 15 U.S.C. §§ 6801.1, *et seq*., and is subject to numerous rules and regulations promulgated on the GLBA statutes.

81.     The GLBA Privacy Rule became effective on July 1, 2001. *See* 16 C.F.R. Part 313. Since the enactment of the Dodd-Frank Act on July 21, 2010, the CFPB became responsible for implementing the Privacy Rule. In December 2011, the CFPB restated the implementing

regulations in an interim final rule that established the Privacy of Consumer Financial Information, Regulation P, 12 C.F.R. § 1016 ("Regulation P"), with the final version becoming effective on October 28, 2014.

82.     Accordingly, Global Atlantic's conduct is governed by the Privacy Rule prior to December 30, 2011, and by Regulation P after that date.

83.     Both the Privacy Rule and Regulation P require financial institutions to provide customers with an initial and annual privacy notice. These privacy notices must be "clear and conspicuous." 16 C.F.R. §§ 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. "Clear and conspicuous means that a notice is reasonably understandable and designed to call attention to the nature and significance of the information in the notice." 16 C.F.R. § 313.3(b)(1); 12 C.F.R. § 1016.3(b)(1). These privacy notices must "accurately reflect[] [the financial institution's] privacy policies and practices." 16 C.F.R. § 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. They must include specified elements, including the categories of nonpublic personal information the financial institution collects and discloses, the categories of third parties to whom the financial institution discloses the information, and the financial institution's security and confidentiality policies and practices for nonpublic personal information. 16 C.F.R. § 313.6; 12 C.F.R. § 1016.6. These privacy notices must be provided "so that each consumer can reasonably be expected to receive actual notice." 16 C.F.R. § 313.9; 12 C.F.R. § 1016.9. As alleged herein, Global Atlantic violated the Privacy Rule and Regulation P.

84.     Upon information and belief, Global Atlantic failed to provide annual privacy notices to customers after the customer relationship ended, despite retaining these customers' PII and storing that PII on its network systems as well as those of its vendors.

85.     Global Atlantic failed to adequately inform its customers that it was storing and/or sharing, or would store and/or share, the customers' PII on an insecure platform, accessible to unauthorized parties from the internet, and would do so after the customer relationship ended.

86.     The Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. § 6801(b), requires financial institutions to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards, including: (1) designating one or more employees to coordinate the information security program; (2) identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, and assessing the sufficiency of any safeguards in place to control those risks; (3) designing and implementing information safeguards to control the risks identified risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures; (4) overseeing service providers and requiring them by contract to protect the security and confidentiality of customer information; and (5) evaluating and adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances. 16 C.F.R. §§ 314.3 and 314.4.

87.     As alleged herein, Global Atlantic violated the Safeguard Rule.

88.     Global Atlantic failed to assess reasonably foreseeable risks to the security, confidentiality, and integrity of customer information and failed to monitor the systems of its vendors or verify the integrity of those systems.

89.     Global Atlantic violated the GLBA and its own policies and procedures by sharing the PII of Plaintiff and Class Members with a non-affiliated third party without providing Plaintiff

and Class Members: (a) an opt-out notice, and (b) a reasonable opportunity to opt out of such disclosure.

*__Global Atlantic Failed to Comply with Industry Standards__*

90.    As noted above, experts studying cybersecurity routinely identify insurance companies as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

91.    Some industry best practices that should be implemented by insurance companies dealing with sensitive PII, like Global Atlantic, include but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and antimalware software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Global Atlantic failed to follow some or all of these industry best practices.

92.    Other best cybersecurity practices that are standard in the insurance industry include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Global Atlantic failed to follow these cybersecurity best practices.

93.    Global Atlantic failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center

for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

94.    Global Atlantic failed to comply with these accepted standards in the insurance industry, thereby permitting the Data Breach to occur.

### *Global Atlantic Breached its Duty to Safeguard Plaintiff's and Class Members' PII*

95.    In addition to its obligations under federal and state laws, Global Atlantic owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in its and its vendor's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Global Atlantic owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols, and those of the parties with whom it shared PII, adequately protected the PII of Plaintiff and Class Members.

96.    Global Atlantic breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data and failed to audit, monitor, or ensure the integrity of its vendor's data security practices. Global Atlantic's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

      a.    Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

      b.    Failing to adequately protect Plaintiff's and Class Members' PII;

      c.    Failing to properly monitor its own data security systems for existing intrusions;

d.  Failing to audit, monitor, or ensure the integrity of its vendor's data security practices;

e.  Failing to sufficiently train its employees and vendors regarding the proper handling of its customers PII;

f.  Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

g.  Failing to adhere to the Gramm-Leach-Bliley Act and industry standards for cybersecurity as discussed above; and

h.  Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' PII.

97.    Global Atlantic negligently and unlawfully failed to safeguard Plaintiff's and Class Members' PII by allowing cyberthieves to access its and its vendor's computer networks and systems which contained unsecured and unencrypted PII.

98.    Had Global Atlantic remedied the deficiencies in its information storage and security systems or those of its vendors and affiliates, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential PII.

### *Common Injuries and Damages*

99.    As a result of Global Atlantic's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) the loss of benefit of the bargain (price premium

damages); (d) diminution of value of their PII; (e) invasion of privacy; and (f) the continued risk to their PII, which remains in the possession of Global Atlantic and its vendors, and which is subject to further breaches, so long as Global Atlantic fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII.

### *The Data Breach Increases Victims' Risk of Identity Theft*

100.    Plaintiff and Class Members are at a heightened risk of identity theft for years to come.

101.    The unencrypted PII of Plaintiff and Class Members will end up for sale on the dark web because that is the modus operandi of hackers. In addition, unencrypted PII may fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the PII of Plaintiff and Class Members.

102.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

103.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity—or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

104.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social

engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data Breaches can be the starting point for these additional targeted attacks on the victim.

105.    One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[20]

106.    With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

107.    The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and

---

[20] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g*., Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/ (last visited Aug. 17, 2023).

sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

108.    Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

***Loss of Time to Mitigate Risk of Identity Theft and Fraud***

109.    As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet the resource and asset of time has been lost.

110.    Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must, as Global Atlantic's Notice Letter instructs,[21] "remain vigilant" and monitor their financial accounts for many years to mitigate the risk of identity theft.

111.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience as a result of the Data Breach, such as researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter.

---

[21] Notice Letter.

112.    These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[22]

113.    These efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[23]

114.    A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[24]



---

[22] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[23] *See* Federal Trade Commission, *IdentityTheft.gov*, https://www.identitytheft.gov/Steps (last visited Aug. 17, 2023).

[24] *Credit Card and ID Theft Statistics*, Jason Steele (Oct. 24, 2017), available at https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php (last visited Aug. 17, 2023).

115.    For those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[25]

### *Diminution in Value of PII*

116.    PII is a valuable property right.[26] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

117.    An active and robust legitimate marketplace for PII exists. In 2019, the data brokering industry was worth roughly $200 billion.[27]

118.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[28] [29]

---

[25] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited Aug. 17, 2023).

[26] *See, e.g.*, Randall T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[27] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Aug. 17, 2023).

[28] https://datacoup.com/ (last visited Aug. 17, 2023).

[29] https://digi.me/what-is-digime/ (last visited Aug. 17, 2023).

119.    Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 per year.[30]

120.    Conversely sensitive PII can sell for as much as $363 per record on the dark web according to the Infosec Institute.[31]

121.    As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available and the rarity of the data has been lost, thereby causing additional loss of value.

122.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change, *e.g.*, names and Social Security numbers.

123.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

124.    The fraudulent activity resulting from the Data Breach may not come to light for years.

---

[30]    Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Aug. 17, 2023).
[31]    *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Aug. 17, 2023).

125.    At all relevant times, Global Atlantic knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members, and of the foreseeable consequences that would occur if its or its vendor's data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

126.    Global Atlantic was, or should have been, fully aware of the unique type and the significant volume of data on Global Atlantic's network, amounting to hundreds of thousands of individuals detailed personal information, upon information and belief, and thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

127.    The injuries to Plaintiff and Class Members were directly and proximately caused by Global Atlantic's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

### *Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary*

128.    Given the type of targeted attack in this case and sophisticated criminal activity, the type of PII involved, and the volume of data obtained in the Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes–*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; filing false tax returns; taking out loans or lines of credit; or filing false unemployment claims.

129.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the

suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

130.    Consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

131.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 per year per Class Member. This is a reasonable and necessary cost to monitor to protect Plaintiff and Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Global Atlantic's failure to safeguard their PII.

***Plaintiff Hansa Thomas's Experience***

132.    Plaintiff Hansa Thomas has been a customer of Global Atlantic since approximately 2014.

133.    As a condition of opening an insurance policy with Global Atlantic, she was required to provide her PII, directly or indirectly, to Global Atlantic, including her name, address, date of birth, and Social Security number.

134.    At the time of the Data Breach—approximately May 29, 2023 through May 30, 2023— Global Atlantic and its vendor retained Plaintiff's PII in its system.

135.    Plaintiff is very careful about sharing her sensitive PII. Plaintiff stores any documents containing her PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted her PII to Global Atlantic had she known of its lax data security policies.

136.    In early August 2023, Plaintiff received a Notice Letter in the mail dated July 28, 2023, from Pension Benefit Information, LLC on behalf of Global Atlantic. According to the

Notice Letter, Plaintiff's PII was improperly accessed and obtained by unauthorized third parties, including her name, Social Security number, date of birth, policy number(s), gender, and state.

137.    As a result of the Data Breach, and at the direction of Global Atlantic's Notice Letter, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach and checking her credit report and accounts for unauthorized activity. Plaintiff has spent significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

138.    Plaintiff suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) lost or diminished value of PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; and (v) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Global Atlantic's and its vendor's possession and is subject to further unauthorized disclosures so long as Global Atlantic fails to undertake appropriate and adequate measures to protect the PII.

139.    The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Global Atlantic has still not fully informed her of key details about the Data Breach's occurrence.

140.    As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

141.    As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

142. Plaintiff has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Global Atlantic's and its vendor's possession, is protected and safeguarded from future breaches.

## V.    CLASS ALLEGATIONS

143. Plaintiff brings this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

144. Specifically, Plaintiff proposes the following Nationwide Class, subject to amendment as appropriate:

> All individuals in the United States whose PII was impacted as a result of the Data Breach (the "Class").

145. Excluded from the Class are Global Atlantic and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any judge to whom this case is assigned as well as their judicial staff and immediate family members.

146. Plaintiff reserves the right to modify or amend the definition of the proposed Nationwide Class, as well as add subclasses, before the Court determines whether certification is appropriate.

147. The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

148. _Numerosity._ The Class Members are so numerous that joinder of all members is impracticable. Although the precise number of Class Members is unknown to Plaintiff, according to the report submitted to the Office of the Massachusetts Attorney General, at least 15,560 Massachusetts' residents were impacted in the Data Breach and according to the report submitted

to the Office of the Delaware Attorney General, at least 5,732 Delaware residents were impacted in the Data Beach.[32][33] Thus, numerosity is met.

149.    <u>Commonality</u>. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

    a.   Whether Global Atlantic engaged in the conduct alleged herein;

    b.   Whether Global Atlantic's conduct violated the FTCA and/or GBLA;

    c.   When Global Atlantic learned of the Data Breach;

    d.   Whether Global Atlantic's response to the Data Breach was adequate;

    e.   Whether Global Atlantic unlawfully lost or disclosed Plaintiff's and Class Members' PII;

    f.   Whether Global Atlantic failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the PII compromised in the Data Breach;

    g.   Whether Global Atlantic's and its vendor's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

    h.   Whether Global Atlantic's and its vendor's data security systems prior to and during the Data Breach were consistent with industry standards;

    i.   Whether Global Atlantic owed a duty to Plaintiff and Class Members to safeguard their PII;

---

[32] https://www.mass.gov/doc/data-breach-report-2023/download (last visited Aug. 28, 2023)
[33] https://attorneygeneral.delaware.gov/fraud/cpu/securitybreachnotification/database/ (last visited Aug. 28, 2023)

j.  Whether Global Atlantic breached its duty to Plaintiff and Class Members to safeguard their PII;

k.  Whether hackers obtained Plaintiff's and Class Members' PII via the Data Breach;

l.  Whether Global Atlantic had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

m.  Whether Global Atlantic breached its duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

n.  Whether Global Atlantic knew or should have known that its and its vendor's data security systems and monitoring processes were deficient;

o.  What damages Plaintiff and Class Members suffered as a result of Global Atlantic's misconduct;

p.  Whether Global Atlantic's conduct was negligent;

q.  Whether Global Atlantic was unjustly enriched;

r.  Whether Plaintiff and Class Members are entitled to actual and/or statutory damages;

s.  Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

t.  Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

150.    Typicality. Plaintiff's claims are typical of those of other Class Members because Plaintiff's PII, like that of every other Class Member, was compromised in the Data Breach.

Plaintiff's claims are typical of those of the other Class Members because, inter alia, all Class Members were injured through the common misconduct of Global Atlantic. Plaintiff is advancing the same claims and legal theories on behalf of herself and all other Class Members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of Class Members arise from the same operative facts and are based on the same legal theories.

151.    <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

152.    <u>Predominance</u>. Global Atlantic has engaged in a common course of conduct toward Plaintiff and Class Members in that all of Plaintiff's and Class Members' data was stored on the same vendor's computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Global Atlantic's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

153.    <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Global Atlantic. In contrast, conducting this action as a class action presents far fewer management

difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

154. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). Global Atlantic has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

155. Finally, all members of the proposed Class are readily ascertainable. Global Atlantic has access to the names and addresses and/or email addresses of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent Notice of the Data Breach by Global Atlantic.

## COUNT I
### Negligence
### (*On Behalf of Plaintiff and the Class*)

156. Plaintiff restates and realleges the preceding factual allegations set forth above as if fully alleged herein.

157. Global Atlantic requires its customers, including Plaintiff and Class Members, to submit non-public PII in the ordinary course of providing its services.

158. Global Atlantic gathered, stored, and shared the PII of Plaintiff and Class Members as part of its business of soliciting its services to its customers, which solicitations and services affect commerce.

159. Plaintiff and Class Members entrusted Global Atlantic with their PII, directly or indirectly, with the understanding that Global Atlantic would safeguard their information.

160. Global Atlantic had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

161.    By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Global Atlantic had a duty of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft. Global Atlantic's duty included a responsibility to exercise due diligence in selecting vendors and to audit, monitor, and ensure the integrity of its vendors' systems and practices and to give prompt notice to those affected in the case of a data breach.

162.    Global Atlantic had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

163.    Global Atlantic's duty to use reasonable security measures also arose under the GLBA, under which it was required to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards.

164.    Global Atlantic owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its and its vendor's systems and networks, and the personnel responsible for them, adequately protected the PII.

165.    Global Atlantic's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Global Atlantic and Plaintiff and Class Members. That special relationship arose because Plaintiff and the Class entrusted Global Atlantic with their confidential PII, a necessary part of being customers of Global Atlantic's companies.

166. Global Atlantic's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Global Atlantic is bound by industry standards to protect confidential PII.

167. Global Atlantic was subject to an "independent duty," untethered to any contract between Global Atlantic and Plaintiff or the Class.

168. Global Atlantic also had a duty to exercise appropriate clearinghouse practices to remove former customers' PII it was no longer required to retain pursuant to regulations.

169. Moreover, Global Atlantic had a duty to promptly and adequately notify Plaintiff and the Class of the Data Breach.

170. Global Atlantic had and continues to have a duty to adequately disclose that the PII of Plaintiff and the Class within its or its vendor's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was and is necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

171. Global Atlantic breached its duties, pursuant to the FTC Act, GLBA, and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' PII. The specific negligent acts and omissions committed by Global Atlantic include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' PII;

b. Failing to adequately monitor the security of its and its vendor's networks and systems;

c. Failing to audit, monitor, or ensure the integrity of its vendor's data security practices;

d.   Allowing unauthorized access to Plaintiff's and Class Members' PII;

e.   Failing to detect in a timely manner that Plaintiff's and Class Members' PII had been compromised;

f.   Failing to remove former customers' PII it was no longer required to retain pursuant to regulations; and

g.   Failing to timely and adequately notify Plaintiff and Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

172.   Global Atlantic violated Section 5 of the FTC Act and GLBA by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Global Atlantic's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damage that would result to Plaintiff and the Class.

173.   Plaintiff and Class Members were within the class of persons the Federal Trade Commission Act and GLBA were intended to protect and the type of harm that resulted from the Data Breach was the type of harm these statues were intended to guard against.

174.   Global Atlantic's violation of Section 5 of the FTC Act and GLBA constitutes negligence.

175.   The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

176.   A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Global Atlantic's inadequate security practices.

177.   It was foreseeable that Global Atlantic's failure to use reasonable measures to protect Plaintiff's and Class Members' PII would result in injury to Plaintiff and Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the insurance industry.

178.   Global Atlantic has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if the PII were wrongfully disclosed.

179.   Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Global Atlantic knew or should have known of the inherent risks in collecting and storing the PII of Plaintiff and the Class, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on its and its vendor's systems.

180.   It was therefore foreseeable that the failure to adequately safeguard Plaintiff's and Class Members' PII would result in one or more types of injuries to Plaintiff and Class Members.

181.   Plaintiff and the Class had no ability to protect their PII that was in, and possibly remains in, Global Atlantic's and its vendor's possession.

182.   Global Atlantic was in a position to protect against the harm suffered by the Plaintiff and the Class as a result of the Data Breach.

183.   Global Atlantic's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

184.     Global Atlantic has admitted that the PII of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

185.     But for Global Atlantic's wrongful and negligent breach of duties owed to Plaintiff and the Class, the PII of Plaintiff and the Class would not have been compromised.

186.     There is a close causal connection between Global Atlantic's failure to implement security measures to protect the PII of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The PII of Plaintiff and the Class was lost and accessed as the proximate result of Global Atlantic's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

187.     Global Atlantic's conduct, as alleged herein, allowed it to gain a competitive advantage over companies offering the same or similar services because, rather than properly implement data security protocols, or verify the integrity of its vendor's systems, as required by statute and industry standards, Global Atlantic diverted money intended to apply to data security towards its own profit. Global Atlantic's conduct, and the unfair advantage realized thereby, creates a race to the bottom by encouraging companies to divert funds intended for data security towards profits in order to remain competitive. The end effect is that both consumers and the marketplace in general are harmed through the widespread adoption of substandard data security practices and the concomitantly increased risk of cyberattacks and fraud and identity theft (which disrupt the lives of victims and impose a burden on the state to investigate and prevent criminal activity).

188.     By collecting and taking custody of Plaintiff's and Class Members' PII with full awareness of both the likelihood of a cyberattack targeted to acquire that information and the severe consequences that would result to Plaintiff and Class Members if the confidentiality of the

PII was breached, Global Atlantic assumed a special relationship that required it to guard against the foreseeable conduct of a criminal third party. If Global Atlantic had not intervened by taking charge of Plaintiff's and Class Member's Private Information, no harm would have resulted to Plaintiffs and Class Members as a result of the Data Breach.

189.    As a direct and proximate result of Global Atlantic's negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; and (v) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Global Atlantic's and its vendor's possession and is subject to further unauthorized disclosures so long as Global Atlantic fails to undertake appropriate and adequate measures to protect the PII.

190.    As a direct and proximate result of Global Atlantic's negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

191.    Additionally, as a direct and proximate result of Global Atlantic's negligence, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their PII, which remains in Global Atlantic's and its vendor's possession and is subject to further unauthorized disclosures so long as Global Atlantic fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

192.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

193.    Global Atlantic's negligent conduct is ongoing, in that it still holds the PII of Plaintiff and Class Members in an unsafe and insecure manner.

194.    Plaintiff and Class Members are also entitled to injunctive relief requiring Global Atlantic to: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT II
### Breach of Third-Party Beneficiary Contract
### (*On Behalf of Plaintiff and the Class*)

195.    Plaintiff restates and realleges the preceding factual allegations set forth above as if fully alleged herein.

196.    Global Atlantic entered into written contracts with its customers to provide insurance and/or other services.

197.    In exchange, Global Atlantic agreed, in part, to implement adequate security measures to safeguard the PII of Plaintiff and the Class and to timely and adequately notify them of the Data Breach. Indeed, Global Atlantic's Privacy Policy states that "Protecting your personal information and respecting your privacy is important to us. We respect your privacy rights and choices, which may vary based on your interactions with us or your relationship to us. These resources can help you understand how we use your personal information and how you can manage your privacy choices."[34]

198.    These contracts were made expressly for the benefit of Plaintiff and the Class, as Plaintiff and Class Members were the intended third-party beneficiaries of the contracts entered into between Global Atlantic and its clients. Global Atlantic knew that, if it were to breach these

---

[34] https://www.globalatlantic.com/privacy-policy (last visited Aug. 17, 2023).

contracts with its clients, the clients' current and former customers—Plaintiffs and Class Members—would be harmed.

199.    Global Atlantic breached the contracts it entered into with its clients by, among other things, failing to: (i) use reasonable data security measures, (ii) implement adequate protocols and employee training sufficient to protect Plaintiff's PII from unauthorized disclosure to third parties, (iii) failing to perform due diligence and to verify, audit, or monitor the integrity of third party networks on which it shared PII, and (iv) failing to promptly and adequately notify Plaintiff and Class Members of the Data Breach.

200.    Plaintiff and the Class were harmed by Global Atlantic's breach of its contracts with its clients, as such breach is alleged herein, and are entitled to the losses and damages they have sustained as a direct and proximate result thereof.

201.    Plaintiff and Class Members are also entitled to their costs and attorney's fees incurred in this action.

**COUNT III**
**Violation of the Washington State Consumer Protection Act**
***(On Behalf of Plaintiff and the Class)***

202.    Plaintiff restates and realleges the preceding factual allegations set forth above as if fully alleged herein.

203.    Global Atlantic is a "person," as defined by Wash. Rev. Code Ann. § 19.86.010(1).

204.    Global Atlantic advertised, offered, or sold goods or services in Washington and engaged in trade or commerce directly or indirectly affecting the people of Washington, as defined by Wash. Rev. Code Ann. § 19.86.010 (2).

205.    Global Atlantic engaged in unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of Wash. Rev. Code Ann. § 19.86.020, including:

a.  Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff and Class Members' Personal Information, which was a direct and proximate cause of the Data Breach;

b.  Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c.  Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Class Members' PII, including duties imposed by the FTC Act;

d.  Misrepresenting that it would protect the privacy and confidentiality of Plaintiff and Class Members' PII, including by implementing and maintaining reasonable security measures;

e.  Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Class Members' PII, including duties imposed by the FTC Act;

f.  Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff and Class Members' PII; and

g.  Omitting suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Class Members' PII, including duties imposed by the FTC Act.

206.  Global Atlantic's representations and omissions were material because they deceived reasonable consumers about the adequacy of Global Atlantic's data security and ability to protect the confidentiality of consumers' PII.

207.    Global Atlantic acted intentionally, knowingly, and maliciously to violate Washington's Consumer Protection Act, and recklessly disregarded Plaintiff and Class Members' rights.

208.    Global Atlantic's conduct is injurious to the public interest because it violates Wash. Rev. Code Ann. § 19.86.020, violates a statute that contains a specific legislation declaration of public interest impact, and/or injured persons and had and has the capacity to injure persons. Further, its conduct affected the public interest, including, upon information and belief, thousands of Washingtonians affected by the data breach.

209.    As a direct and proximate result of Global Atlantic's unfair or deceptive acts or practices, Plaintiff and Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their PII.

210.    Plaintiff and Class Members accordingly seek all monetary and non-monetary relief allowed by law, including actual damages, treble damages, injunctive relief, civil penalties, and attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    For an Order certifying this action as a class action and appointing Plaintiff and her counsel to represent the Class;

B.    For equitable relief enjoining Global Atlantic from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class

Members' PII, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C.     For equitable relief compelling Global Atlantic to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of PII compromised during the Data Breach;

D.     For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

    i.     Prohibiting Global Atlantic from engaging in the wrongful and unlawful acts described herein;

    ii.     Requiring Global Atlantic to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

    iii.     Requiring Global Atlantic to delete, destroy, and purge the PII of Plaintiff and Class Members unless Global Atlantic can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

    iv.     Requiring Global Atlantic to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

    v.     Prohibiting Global Atlantic from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

    vi.     Requiring Global Atlantic to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct

testing, including simulated attacks, penetration tests, and audits on its and its vendor's systems on a periodic basis, and ordering Global Atlantic to promptly correct any problems or issues detected by such third-party security auditors;

vii.   Requiring Global Atlantic to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.   Requiring Global Atlantic to audit, test, and train its security personnel regarding any new or modified procedures;

ix.   Requiring Global Atlantic to segment data by, among other things, creating firewalls and access controls so that if one area of its network is compromised, hackers cannot gain access to other portions of its systems;

x.   Requiring Global Atlantic to conduct regular database scanning and securing checks;

xi.   Requiring Global Atlantic to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling PII, as well as protecting the personal identifying information of Plaintiff and Class Members;

xii.   Requiring Global Atlantic to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.   Requiring Global Atlantic to implement a system of tests to assess its employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with its policies, programs, and systems for protecting PII;

xiv.   Requiring Global Atlantic to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor its information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.   Requiring Global Atlantic to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xvi.   Requiring Global Atlantic to implement logging and monitoring programs sufficient to track traffic to and from its servers; and

xvii.   For a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Global Atlantic's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the Class, and to report any deficiencies with compliance of the Court's final judgment.

E.   For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Global Atlantic's wrongful conduct;

F.   Ordering Global Atlantic to pay for not less than ten years of credit monitoring services for Plaintiff and the Class;

G.     For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

H.     For an award of punitive damages, as allowable by law;

I.     For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

J.     Pre- and post-judgment interest on any amounts awarded; and

K.     Such other and further relief as this court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

DATED: August 28, 2023                    Respectfully Submitted,

/s/ M. Anderson Berry
M. Anderson Berry
Gregory Haroutunian
**CLAYEO C. ARNOLD**
**A PROFESSIONAL CORPORATION**
865 Howe Avenue
Sacramento, CA 95825
Phone: (916) 239-4778
Fax: (916) 924-1829
*aberry@justice4you.com*
*gharoutunian@justice4you.com*

Timothy W. Emery*
Patrick B. Reddy*
Paul Cipriani*
**EMERY REDDY, PLLC**
600 Stewart Street, Suite 1100
Seattle, WA 98101
Phone: (206) 442-9106
Fax: (206) 441-9711
*emeryt@emeryreddy.com*
*reddyp@emeryreddy.com*
*paul@emeryreddy.com*

*\*pro hac vice forthcoming*

*Attorneys for Plaintiff and the*
*Proposed Class*